65 A.3d 154

Joseph William PAYNE and Jason BOND

v.

STATE of Maryland.

No. 2156, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Feb. 27, 2013.

Reconsideration Denied June 3, 2013.

Thomas M. Donnelly & Joseph B. Tetrault, Baltimore, MD, for appellant.

Jeremy M. McCoy (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: MEREDITH, WRIGHT and ARRIE W. DAVIS (Retired, Specially Assigned), JJ.

ARRIE W. DAVIS (Retired, Specially Assigned), J.

Appellants, Joseph W. Payne and Jason Bond, were charged and tried by a jury in a joint trial in the Circuit Court for Baltimore County on charges of first-degree murder and related offenses in the shooting death of Glen Stewart. The jury acquitted Payne and Bond of first-degree premeditated murder, assault in the first degree and conspiracy to commit kidnapping, but convicted them of first-degree felony murder, kidnapping and use of a handgun in the commission of a felony. Payne and Bond were each sentenced to a term of life imprisonment for first-degree felony murder, with all but fifty years suspended and concurrent sentences of five years without parole on the handgun counts, the court merging the kidnapping convictions. Appellants filed this timely appeal and appellant Payne presents the following questions for our review:

I. Did the circuit court err in allowing "cell phone tower" evidence without a foundation by an expert?

II. Did the circuit court err in admitting the hearsay statements of purported co-conspirators when there was no proof that appellant was part of the conspiracy?

Appellant Bond also raises a third question for our review: [1]

III. Did the trial court err in failing to grant a mistrial when the State elicited inadmissible hearsay evidence as to who allegedly committed the murder in this case which severely prejudiced appellant and improperly bolstered the State's case?

For the reasons that follow, we conclude that the trial court abused its discretion by permitting testimony about cellular tower site location without qualifying the State's witness as an expert and that the error is not harmless beyond a reasonable

---

1. Bond adopts by reference co-appellant Payne's argument, pursuant to Md. Rule 8–503(f).

doubt. We shall, therefore, vacate the convictions of Payne and Bond and remand for a new trial. We shall also address the evidentiary questions as they may arise again on retrial.

## FACTUAL BACKGROUND

Officer Christopher Winter of the Baltimore County Police Department testified that, at approximately 2:00 a.m. on August 27, 2007, he was on patrol and responded to a call of a body on fire in the woods located at Villa Nova and Queen Anne Roads in Pikesville. Officer Winter described what he found at the scene: "It was a black male laying [sic] on his back still smoldering, smoking." Members of the fire department, who had also been called to the scene, discovered the body in the woods. Robert Latane, who lived on Villa Nova Road, testified that, on the night in question at approximately 10:00 p.m., he and his wife were watching television when Latane heard what he thought was gunfire: "[W]e heard three pops. Pop. Pop. Pop. Like that." He looked outside his door but did not see anything significant.

The medical examiner, Dr. Mary Ripple, examined the body of the victim in this case, Glen Stewart. Dr. Ripple testified as follows:

> Well, in general there were injuries to Mr. Stewart's body. There were three gunshot wounds to his head and neck. In addition, there were some drag-type scrapes and abrasions primarily to his back, which had underlying soft tissue hemorrhage and intramuscular trauma. There were post mortem burns over about three-quarters of the body, 75 percent of the body. And in addition, there was a partial burned cloth ligature around the neck, some small hemorrhages in the eyes.

There was evidence that two of the three gunshot wounds to the victim's head were the result of close range firing, including the wound in the center of the victim's forehead and the wound in the victim's neck. Three large-caliber bullets were recovered from the victim's body. Dr. Ripple opined that the

cause of death was multiple gunshot wounds and that Stewart was dead by the time the body was burned.

Detective Brian Edwards of the Baltimore County Police Department testified that, after police identified the victim as Glen Stewart, he responded to Stewart's residence, spoke with family members and searched his bedroom. There, the detective found a piece of paper next to Stewart's bed containing names and phone numbers, including the name "Weasey." After subpoenaing the phone records for those numbers, the detective was also able to identify phone records for numbers pertinent to the case which were associated with appellants. Detective Edwards testified that he subpoenaed the phone records for appellants and, from the original electronic spread sheet, was able to isolate calls relating to those numbers made on August 26 and 27, 2007 around the suspected time of the murder.

According to Detective Edwards, Bond had twenty-one regular cell phone activations and thirty-nine "direct connect" activations[2] for the dates in question. Detective Edwards "[w]as able to determine information from their records that indicated the time of the call, either dial digits or a phone number that the call was placed to or from, and also a cell tower that the equipment was operating off of for that call." There then ensued objections by both defense counsel, contending that Detective Edwards was offering expert testimony without a proper foundation. As we will discuss in more detail in the discussion that follows, the court ultimately allowed Detective Edwards to testify to the locations of the cell phone towers that were accessed by appellants' cell phones on or around the time of the murder.

Consequently, Detective Edwards testified that Bond was the recipient of a Direct Connect call at 9:14 p.m. on August 26, 2007, the day of the murder, and that the call registered off a cell phone tower at Menlo Drive, located one and a half to two miles from the scene of the crime. Bond also received

---

2. Direct connect is essentially a digital walkie-talkie feature.

a direct connect call at 1:03 a.m. on August 27, 2007 at approximately the same time that the fire department received the call to respond to Villa Nova and Queen Anne Roads. This call registered off a cell phone tower atop the Balmoral Towers building at the corner of Liberty Road and Saint Luke's Lane, approximately a mile from the crime scene. Detective Edwards testified that this was the only time Bond's phone registered off this particular tower from August 23, 2007 to August 30, 2007.

As for appellant Payne, Detective Edwards obtained his cell phone records for a period spanning from August 3, 2007 to August 31, 2007. He limited the records to the period from the time of the report of shots fired at Villa Nova Road to the time of the fire. The detective testified that Payne apparently did not answer a call that was placed to his cell phone at 10:02 p.m. on August 26, 2007, but that the call activated off the Balmoral building cell phone tower, which, again, was located approximately a mile from the crime scene.

On cross-examination, Detective Edwards agreed that he had heard that "the range of a cell phone is an unlimited line of sight." He testified that line-of-sight depended upon a number of factors, including topography. When asked, hypothetically, if a cell phone tower was located in one corner of the courtroom and another tower in another corner, that the way a person held his or her cell phone determined which tower would be accessed, Detective Edwards replied, "I don't know." He then agreed that he could not tell precisely how far the cell phones were from the towers when the calls were made. When asked, with unlimited line-of-sight if it were possible that a person could be standing on top of the World Trade Center in the Inner Harbor and access a particular cell tower, Detective Edwards replied "I suppose that could be possible."

On further cross-examination, Detective Edwards testified that Christopher Johnson and Desmond Jones had robbed Donald Bland, also known as Cuzo, also known as "ATL" on August 24, 2007. Stewart had been present during the rob-

bery. Finally, Detective Edwards testified that he returned to the scene of the crime in November of 2007 and found a set of gold caps or fronts, belonging to Stewart, which had been overlooked by the crime scene technicians.

Brittany Keller, Christopher Johnson's girlfriend and a cousin to both appellants, testified that, on the evening of the murder, she was at her aunt's house with her baby and Tyrice McCant, the mother of Payne's child. At some point, the appellants were also present. Keller left that gathering at around 9:00 p.m., went to a friend's house and then went home. Keller testified that her car did not break down that evening and, after seeing appellants at the gathering, she did not see or hear from them the rest of the night.

When the police first questioned Keller in early November, she admitted during trial that she told them that appellants, as well as Johnson and Jones, known to her as "Weasey," were with her on the night in question. She also told the police that the four men had assisted her when her car ran out of gas. She admitted that Ms. McCant had asked her to tell this story to the police. Keller also admitted she discussed this story with Bond. Regarding her discussion of this false alibi with Payne, Keller testified: "As far as Joey was concerned, I spoke with him about what was said by Jason, but I didn't know what he was going to do as far as the police were concerned." She testified that, at some point, Payne knew that she had lied to police.

As will be discussed further in the analysis that follows, the trial court allowed recordings of wiretapped cell phone conversations to be played for the jury over a continuing objection.[3] In the first conversation between Bond and Keller, Bond stated that he wanted to be certain that Keller had not deviated from the alibi that appellants came to assist her when she ran out of gas on the night of the murder. Another wiretap recording of Keller's conversation with Payne, made

---

3. On February 7, 2012, this Court granted the joint motion to include transcripts of these recordings in the record on appeal.

immediately after she talked to Bond, was played for the jury. In that conversation, Keller told Payne that Bond had been questioned by the police: "Jason just called me and they came to see him so umm I don't know if you . . . inaudible . . . me to tell you when I get there or what[']s up." Payne's reply was that she would tell him when she arrived and the conversation ends.

Tyrice McCant testified that, on October 23, 2007, she told police that she did not know anything about the murder and that Keller's car ran out of gas and the four men had rendered her assistance. At trial, McCant acknowledged that the story was false. After Keller dropped her off at her house that evening around 9:00 p.m., McCant did not see appellants, Jones or Johnson again until after midnight, when the group arrived at her house. At that time, she noticed that Jones appeared "frantic and looked like he was scared." McCant testified that she placed two anonymous calls to the Baltimore County Police Department in the fall of 2007 using an assumed name, in which she provided the police information about the Stewart murder, including the identities of the perpetrators. The trial court did not permit her to provide specific names of the individuals identified during those calls at trial.

Desmond Jones, also known as "Weasey," knew Bond and Payne and was appellants' co-defendant, scheduled to be tried subsequent to appellants' trial. He testified pursuant to a plea agreement in which he would plead guilty to conspiracy to commit kidnapping and testify against Payne and Bond in exchange for a thirty-year sentence. According to Jones, he was with Christopher Johnson behind the Rogers Avenue Metro station when Johnson pistol-whipped and robbed Donald Bland, Jr. Bland was accompanied at the time by Glen Stewart. Stewart was standing behind Jones and Johnson during the robbery and assault and watched, but did not attempt to intervene.[4]

---

4. On cross-examination, Jones testified that Bland was robbed because he owed Jones fifteen dollars for drugs.

A rumor was widely circulated that Stewart had reported the robbery of Bland to the police. Jones confronted Stewart about the rumor and Stewart denied any cooperation with police. At approximately 8:00 p.m. on the night of the murder, Jones called Stewart, in the presence of Payne, Bond and Johnson and invited him to come smoke marijuana with them. When Stewart arrived, he began smoking and talking with the four men about the robbery and whether Stewart had been talking to anyone about the robbery. After they went to a nearby elementary school to smoke some more, Jones testified that Payne then "grabs the boy and slams him on the floor and hit him in his face." According to Jones, either Bond or Johnson had a gun and, after beating Stewart some more, the group then put Stewart into the back seat of Payne's car, seated between Johnson and Bond. Jones described this and the aftermath as follows:

> Glen was fighting for his life for real. He bit the boy Chris on the arm. And I looks back. I think he had a white shirt tied around his mouth. Then he got to the destination. They drag him out the car, put him inside the woods. By the time I walk over there, I heard Payne screaming, just—this is far enough. Chris just shot him twice. Then Payne said shoot him again. He shot him again. By then I'm running back to the car. And drove back to Tyrice['s] house.

After returning to McCant's house and smoking for an hour or two, the four went to the 7–Eleven, obtained gasoline and drove back to the scene of the murder. Jones testified that he and Bond stayed in the car and that Payne and Johnson went back to the woods and set the body on fire. Jones testified that, after he saw the victim's body on fire, Payne and Johnson ran back to the car and the group left.

The four men then had discussions "to get their story straight" if they were "pulled up" by the police. They concocted the story that Brittany Keller had a flat tire and that they drove out to fix it for her. Jones had spoken with Bond "about getting [the] story straight," and acknowledged that, as

far as he knew, Keller's car never did break down, have a flat tire or run out of gas that night.

Jones recounted that he had phone conversations with Bond in December of 2007; the recordings of these conversations were admitted into evidence. In the conversations, Jones and Bond discussed the police investigation of the murder and the story they intended to tell police. In a wiretap recording of a cell phone conversation between Bond and Jones on December 12, 2007, Bond instructed Jones to "[p]ut shit on private." Immediately after the transcription ends, Bond called Jones again and it appears from the wiretap that he was upset that Bond had given the name "Weasey" to the police.

The next wiretap recording played for the jury is another cell phone conversation between Bond and Jones on the same day. Both appear nervous that "the Feds are on us. . . ." After that, the jury heard another phone conversation between Bond and Jones, which shows concern about keeping their versions consistent with those of Keller and McCant. In the final recording between Bond and Jones, Bond asks Jones for Keller's telephone number. In a recording already played for the jury, Bond immediately called Keller to be certain that she did not deviate from the story that she had run out of gas.

The State's final witness was Detective Al Barton, who investigated the murder of Stewart along with Detective Edwards. After responding to the home of the victim, Barton testified that one of the last calls to the Stewart residence prior to Stewart's death was from Jones' cell phone. Also included in Jones' phone records were numbers associated with Bond and Payne. Detective Barton provided his interpretation of the cell phone records:

> [W]hen we looked at the historical phone records for two phones in particular, we found that Joseph Payne's phone was registered off a cell tower near the crime scene at 10:00:03, which is around the time the shots were heard. We noticed that the cell phone later determined to be used by Jason Bond was registered off the cell tower near the

crime scene at 1:03, around the time the fire was discovered.[5]

Detective Barton then testified that he also reviewed the cell phone records for Payne. From August 3rd to August 31st, 2007, there had been 1,978 phone calls made by Payne's phone. Over objection, Barton was permitted to testify that the phone call made to Payne's phone on the night of the murder was the only time any of these thousands of phone calls were processed through the Balmoral cell tower near the crime scene. Detective Barton also provided testimony concerning anonymous tips received during the course of the investigation and we will discuss that in the following analysis. Additional facts will be provided as warranted in the following discussion.

## DISCUSSION

### I

■ Appellants assign error to the circuit court's admission of "cell phone tower" evidence without a foundation by an expert witness. Detective Edwards, they complain, should not have been permitted to offer lay testimony regarding the details of cellular telephone tower operations, usage, signals and position because the testimony was the only independent evidence to corroborate the testimony of Jones, an accomplice, who testified that appellants were present when Stewart was killed and his body burned. Appellants rely heavily on our decisions in *Coleman–Fuller v. State*, 192 Md.App. 577, 995 A.2d 985 (2010) and *Wilder v. State*, 191 Md.App. 319, 991 A.2d 172, *cert. denied*, 415 Md. 43, 997 A.2d 792 (2010).

The State counters that *Wilder* and *Coleman–Fuller* are distinguishable in that the officers in those cases interpreted

---

5. Prior to this testimony, at a bench conference, both defense counsel objected to Barton's testimony. Payne's counsel specifically argued that it appeared it was going to be "duplicitous" of Detective Edwards' earlier testimony. When the prosecutor proffered that he was not going to go over the same evidence, the court stated, "[t]hen why are we up here before we get there?"

the phone records and cell tower locations to draw conclusions about the respective defendants' location, whereas, in the case *sub judice*, "Detective Edwards simply testified as to factual, objectively verifiable information regarding appellant's cell phone records and cell tower locations, without drawing conclusions or rendering any opinion regarding the location of appellants or their cell phones." According to the State, "there was no 'opinion' testimony, lay or otherwise, in this case and, even if it did constitute opinion testimony, there was no need for the State to produce an expert to testify regarding the facts relating to appellants' cell phone records." [6]

We hold that *Wilder* and *Coleman–Fuller* are controlling in this case and that the trial court erred in admitting the lay opinion of Detective Edwards. We also hold that the error was not harmless beyond a reasonable doubt and that a remand for further proceedings is in order.

During Detective Edwards' testimony, the following ensued:

[WITNESS]: There was one call of most interest at—

[BOND'S COUNSEL]: Objection.

THE COURT: Well, sustained to the characterization. Just the number of calls.

[WITNESS]: The time frame to the call immediately before the 10 o'clock pertinent time to just I guess within 15 minutes or so of the call for the report of fire, we have two calls of interest, one at 9:14:36 p.m. on August 26, 2007, and one at 1:03:13 a.m. on August 27, 2007.

[STATE]: What did you do with those calls?

---

6. Although Detective Barton also offered testimony that put appellants' cell phones near the crime scene on the night of the murder, arguably without a timely objection or motion to strike, the State does not argue that this issue is not preserved. Considering this, as well as the fact that defense counsel indicated an objection to Detective Barton's testimony along these lines at a bench conference prior to the State asking the question, we conclude that this issue was sufficiently developed at trial for appellate review.

[WITNESS]: Those calls, as well as many others, I examined the records that I obtained from the Sprint Nextel Company, was able to determine—

[BOND'S COUNSEL]: Objection.

THE COURT: Overruled.

[WITNESS]: Was able to determine information from their records that indicated the time of the call, either dial digits or a phone number that the call was placed to or from, and also a cell tower that the equipment was operating off of for that call.

[STATE]: By that you mean cell phone?

[WITNESS]: Cell phone, yes.

[STATE]: In regard to the first of those calls, the 9:14 call, were you able to determine what cell phone that call—

[BOND'S COUNSEL]: Objection.

[PAYNE'S COUNSEL]: Objection. May we approach?

(The following discussion was held at sidebar:)

[PAYNE'S COUNSEL]: Your Honor, we now have the police officer interpreting the records that were kept by the custodian and properly authenticated. But we have no, absolutely no information about the detective's ability to interpret those records. And without a foundation, I am objecting.

And in addition, your Honor, they are highly technical aspects of cell tower usage. Cell towers are not unlimited. When a cellular tower becomes overflowed, it automatically refers its signal to another tower. You can have but one call and up to two or three referrals for a tower.

But the point is there is no expertise on the part of this witness to express or to talk about how those signals are received by towers and whether they originated with that tower or come from a relay tower.

[BOND'S COUNSEL]: I would object. I agree and adopt the whole argument of [Payne's Counsel]. I think it's improper. He is not qualified to testify as to the things he is going to testify to.

THE COURT: [State]?

[STATE]: He's not an expert. He doesn't need to be an expert because I am not asking him for an expert opinion as to where this phone was in terms of direction or latitude or longitude or specific location. I am asking what the record says. I can go through some very basic steps to show how he was able to use the records, and the actual records themselves that have that step-by-step process. And I was going to do that in my next area.

The court initially agreed that the State needed to show more in the way of foundation. After testimony resumed and Detective Edwards was directed to an instruction sheet for helping to interpret the records, defense counsel objected and the jury was excused. Defense counsel proffered that they never received this instruction page and that this was expert testimony. The State responded "I don't know if this specific piece of paper was sent over in discovery along with the cell phone records," but asserted that the instructions that came with the Sprint Nextel records provided the foundation. The following then ensued:

THE COURT: I haven't kept records. I was just looking at them to see what they are.

To me, the distinction is the following. The detectives look at records and say based upon these records, here's what calls came in and the time, here's what cell tower that call bounced off. Unless there are separate records beyond that.

[BOND'S COUNSEL]: But it's not. It doesn't say where the cell tower is. Just gives a number.

THE COURT: But you can get it. That information is contained—obtainable through Sprint records and it's historical data. They keep a record of what number you call or what number you are dialing and what tower it reflected off of.

[BOND'S COUNSEL]: But it doesn't tell you this is Tower C located in Loch Raven.

THE COURT: It says tower number blah, blah, blah. You can then plug it in and get latitude and longitude. All he is doing is saying is this is what this is.

[BOND'S COUNSEL]: And you don't need an expert to do that? I can't do that. I'm a lay person. Anything above what a lay person can do I would think an expert would be necessary.

THE COURT: Well—

[BOND'S COUNSEL]: I may be a low-grade person or technical person but not very smart. I would think that an expert would still be needed for the expertise.

Payne's counsel then interposed the following objection:

Your Honor, here's the problem. There are a number of problems but the two that seem to be most striking are, number one, that the detective has used instructions that came along with the records apparently from this telephone organization. We didn't get those explanations. We got the records but we didn't get the explanation.

Basically what is happening here is there is an expert somewhere in Teaneck, New Jersey, who wrote these things. The detective is going to rely upon them. We didn't even receive them to review them. And the detective—I mean, maybe I'm wrong, maybe he's received this education. But the records indicate beginning towers and ending towers and they gave latitude and longitude but they don't indicate in the records where it talks about beginning towers and ending towers.

We also don't deal with whether or not the beginning tower is the beginning of the calls as routed in the system or whether it's been bounced off three other towers to get to the beginning tower.

And I don't think the detective has expertise to deal with those issues and yet his testimony is going to sound like he is concretely informed by the records that this is the beginning tower at this location. I wouldn't be surprised if the next thing we hear out of him is the radius of distance

by signal from the phone to the tower. And at that point my young friend is going to explode.

\* \* \*

We have a lay person talking about highly technical things and there is no foundation that any of the data is valid. The records are there but his interpretation of it requires a great deal of technical expertise that he doesn't have.

Still outside the presence of the jury, Detective Edwards informed the court that the Nextel instructions

[u]se the last two sets of numbers, first being the lag ID, second being the cell ID. Says match that to the table, which there is [sic] multiple ways you can get the cell tower information. There's a Web site that maintains it, secure Web site. There's an Excel spread sheet that comes with the records. Go in there, search that lag. It gives you the latitude and the longitude. Says you can use any mapping software. You look at it, find the point on the map where the cell site is located.

Detective Edwards further asserted that the "key" to explaining the cell phone records was not produced from those records: "That is not—this is something I produced from another document." According to appellants, the other document was never identified. In overruling the objection to the testimony of Detective Edwards, the circuit court relied on an unreported opinion from the Eleventh Circuit.[7] The court ruled as follows:

What is before us now is really a question of whether the detective's testimony is actually lay testimony or more in the nature of expert testimony for which there's no foundation that's been laid.

The issue was before the Eleventh Circuit recently in *United States versus Feliciano*, which is 300 [Fed.Appx.] 795 (2008). Cert. was denied by the Supreme Court. Basi-

---

**7.** The opinion is *United States v. Feliciano*, 300 Fed.Appx. 795 (11th Cir.2008) (per curiam), 2008 U.S.App. LEXIS 24169 (Nov. 25, 2008).

cally it said the line between expert and opinion testimony is not easy to draw. A law enforcement officer may be qualified to provide both lay and expert testimony.

And then it talks about whether the officer's testimony in talking about cell tower locations crossed the line from lay to expert and they find that it did not. In reviewing cellular telephone records in a summary of those calls, which identified cellular sites for each call, then based on personal knowledge concerning the location of the cell towers, he testified to those calls and where they were in relation to those towers.

I mean, if we are talking about the same thing here, the only issue is whether you actually got the ledgers so that you can independently verify the tower locations indications that was shown both on the records and pictorially on maps that were included in the wiretap summary and it seems to me that the information is there in those records and that the officer can testify to it.

So, for those reasons, I am overruling the objection to the information.

Subsequent to the court's ruling, Detective Edwards testified that a telephone call from Bond's cell phone registered off of a cellular tower "at a latitude and longitude of 39.350854 by negative 76.696565 located on Menlo Drive" which was approximately one and one half to two miles away from the crime scene at approximately the time when the crime occurred. At approximately 1:00 a.m. on August 27, 2007, another call had been placed from Bond's cell phone registering off of a cellular tower at latitude and longitude 39.34364 by negative 76.72851, a location known as Balmoral Towers, located approximately one mile from the crime scene. Over objection, Detective Edwards then identified the map which has been generated as a mapping program that depicted the aforesaid locations. Finally, Detective Edwards testified that Paynes' cellular-phone activated off of one of the towers located in proximity to the crime scene at 10:02 a.m. on August 26, 2007.

Maryland Rule 5–701 provides:

If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

In addition, Maryland Rule 5–702 provides:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

In *Ragland v. State*, 385 Md. 706, 870 A.2d 609 (2005), two police officers, neither of whom had been proffered or qualified as an expert witness, opined, over objections, that, based on their observations, Ragland had been engaged in a drug transaction. Ragland was convicted of distribution of cocaine and appealed, claiming that the court erred in allowing the officers to render their opinions based on lay testimony. The Court of Appeals agreed with Ragland, and ruled that the opinion testimony of those officers was expert testimony, given the nature of their conclusions. Such testimony was inadmissible because the discovery and evidentiary predicates had not been satisfied. The Court of Appeals held that Md. Rules 5–701 and 5–702 prohibit the admission of "lay opinion" testimony based upon specialized knowledge, skill, experience, training or education. *Id.* at 725, 870 A.2d 609.

In *Wilder*, 191 Md.App. 319, 991 A.2d 172 (2010), the defendant was convicted of first-degree assault, reckless endangerment, and use of a handgun in the commission of a crime of violence. *Id.* at 326, 991 A.2d 172. Before trial, the "defense moved in limine to exclude testimony about how the

police managed to track [the defendant's] movements, at or near the time of the shootings, by use of cellular telephone records." *Id.* at 348, 991 A.2d 172. Upon making the motion, the following colloquy ensued:

[DEFENSE COUNSEL]: ... What my main worry is, Your Honor, is that a detective's gonna take the stand and state, at 4:47 a.m., [the defendant's] phone was hitting off of this tower in the general location of where the shooting took place.

On cross examination I'm not gonna be able to get into anything 'cause he's' not an expert on this.

He's gonna testify to what the tower information is, and I think it needs to come in through an expert who can testify to where the towers are located, how close the towers are, how a phone pings off a certain tower compared to one two miles away, all this information that would come out, and I don't think a detective—unless [the State] says this detective has that kind of expertise, and I don't think he does.

\*　　\*　　\*

[THE STATE]: ... [The detective] is not going to render any opinion whatsoever, neither expert nor lay nor otherwise.

\*　　\*　　\*

I will let the Court know that [the detective] is, in fact, not an expert. And I am not attempting to qualify him as such, but he was able to do this just using the certified records.

All he did was look at the records and plot out the towers and the calls that correspond to the towers using just the information from the records, and that's all he's going to testify about with regard to this particular issue.

\*　　\*　　\*

[DEFENSE COUNSEL]: ... This is a highly technical situation where they are claiming that my client is in the general location. I need to know how big of a tower area this is. I don't know if he knows the answer to that. I

don't know if he knows what the next closest tower is, Your Honor.

I'm not saying he's an expert, but I'm saying it should come in through an expert.

I mean, this is highly—I mean, the evidence that they're gonna put in is that he is—his cell phone is in the area at the time of the shooting. I mean, that's an extremely large part of the State's case in this case, because there's no eyewitness to him actually doing it.

They're gonna say, cell phone. And if I don't have the ability to do any cross examination on that because their detective's gonna say, I don't know, I don't know, then I'm left with nothing, Your Honor.

[THE COURT]: ... He's taking some records that are certified and he is plotting some points on them. He's not going to express any opinions after he's plotted those points.

[DEFENSE COUNSEL]: ... He's gonna have to express some sort of an opinion that the cell phone was in this area.

[THE COURT]: No. [The State] said he's not going [to] express any opinions.

[DEFENSE COUNSEL]: All right.

[THE COURT]: And, in fact, since he's not being called as an expert and not being qualified as such, he wouldn't be able to ex—

[DEFENSE COUNSEL]: Okay.

[THE COURT]:—to express that opinion.

[DEFENSE COUNSEL]: I guess we'll have to wait to see how he testifies.

\*        \*        \*

[THE COURT]: All right. So that defense motion at this point is—it's not granted at this time.

*Id.* at 350–54, 991 A.2d 172.

The detective then testified about how he was able to track the defendant's whereabouts through the use of cellular telephone tracking and Global Positioning System technology. *Id.*

at 354, 991 A.2d 172. During this testimony, defense counsel objected to the detective testifying that he confronted the defendant with cellular telephone records that contradicted his account of the events that allegedly transpired. *Id.* at 354, 991 A.2d 172. Defense counsel also objected to the detective's description of the software that he used to create a map of the locations where the defendant made cell phone calls before, during and after the shooting. *Id.* Finally, when the State moved to admit an exhibit, *i.e.,* a printout of the software-created map, defense counsel objected again. *Id.* The map was admitted over counsel's objection. *Id.* Later, the detective testified that he had used the technique of charting telephone call locations in the computer software "approximately 25" times. *Id.* at 356, 991 A.2d 172.

On appeal, the defendant asserted that the admission of the detective's testimony directly contradicted the holding of *Ragland. Wilder,* 191 Md.App. at 361–62, 991 A.2d 172. Against the backdrop of *Ragland,* we determined "that the better approach is to require the prosecution to offer expert testimony to explain the functions of cell phone towers, derivative tracking, and the techniques of locating and/or plotting the origins of cell phone calls using cell phone records." *Id.* at 365, 991 A.2d 172. Although "cellular telephone technology has become generally understood," we stated that *Ragland* indicated that any opinion derived from a witness's experience or training must be admitted as expert testimony. *Id.* at 367–68, 991 A.2d 172. We then concluded that the detective should have been qualified as an expert because his training and experience enabled him to map the defendant's locations based on his cellular telephone records. *Id.* at 368, 991 A.2d 172.

In *Coleman–Fuller,* 192 Md.App. 577, 995 A.2d 985 (2010), the defendant was indicted for first-degree murder. *Id.* at 580, 995 A.2d 985. Prior to trial, the defendant proffered a "motion in limine regarding the State's attempt to introduce cell phone records and cell phone tracking evidence through a detective instead of an expert witness." *Id.* The court denied the motion. *Id.* During trial, Detective Gary Childs "testified extensively from the cell phone records of two cell phones

recovered from [the defendant] at the time of his arrest." *Id.* at 589, 995 A.2d 985. Over defense counsel's objection, the detective used the records and cellular telephone tower sites to illustrate the defendant's locations before, during and after the murder. *Id.* During the trial, Detective Childs also testified that he was qualified to decipher cellular telephone records because he "attended a school for cell phone analysis," and had "been doing this ... for a number of years." *Id.* at 614, 995 A.2d 985.

In objecting to the detective's testimony, the defendant argued that the detective "was not a disclosed and qualified expert and he rendered opinions on a topic that was beyond the purview of the ordinary lay juror." *Id.* at 614–15, 995 A.2d 985. On appeal, we concluded that only a person with training and experience would know that cellular telephone technology permits individual phones to function by locking onto the nearest side of the nearest and/or strongest tower. *Id.* at 615, 995 A.2d 985. We concluded:

> Patently, the testimony of Detective Childs is equivalent with that of the detective in *Wilder.* Similar to the detective in *Wilder,* utilizing the data from the cell phone records, Detective Childs rendered an opinion on appellant's location at the time of the calls, stating that the phone records were consistent with appellant's presence in the vicinity of the murder around the time it happened. From the cell phone records, he testified that he was able to determine whether the location of individuals was consistent with their statements to police and their testimony. Neither Detective Childs nor the detective in *Wilder* were qualified as experts, but rather, stated that their training was the result of certification from the cell phone company. Under our holding in *Wilder,* it was clearly error for the court to admit this evidence without expert testimony. On remand, this evidence may only be introduced through a witness qualified as an expert.

*Coleman–Fuller,* 192 Md.App. at 619, 995 A.2d 985.

Here, Detective Edwards obtained Payne's and Bond's cell phone records in electronic form from Sprint Nextel in the

form of a spreadsheet. He extracted their records from that spreadsheet, limiting them to August 26th and 27th. According to Detective Edwards, the cell tower information may be obtained by matching the lag ID and the cell ID to the table and, utilizing this information as well as information available on the Sprint Nextel Web Site, the latitude and longitude of the tower can be determined by use of mapping software. Detective Edwards further asserted that the "key" to explaining the cell phone records was not produced from those records: "That is not—this is something I produced from another document."

Employing this procedure, Detective Edwards testified that Bond's cell phone registered off of a cellular tower at a latitude and longitude located on Menlo Drive, which was approximately one and one half to two miles away from the crime scene at approximately the time when the crime occurred. He further testified that another call had been placed from Bond's cell phone registering off of a cellular tower at approximately 1:00 a.m. on August 27, 2007, at the latitude and longitude of a location known as Balmoral Towers, approximately one mile from the crime scene, at around the time the fire department responded to the scene. Detective Edwards thereafter identified the map which had been generated as a mapping program that depicted the aforesaid locations. Finally, Detective Edwards testified that Paynes' cellular-phone activated off one of the towers located in proximity to the crime scene at 10:02 a.m. on August 26, 2007.

We are persuaded that this case is controlled by the decisions in *Wilder* and *Coleman–Fuller*. Thus, we hold that the court erred in admitting lay testimony regarding cell phone tower evidence in tracking of the location of appellants at the time of the murders. We also reject the State's attempt to distinguish those cases on the grounds that Detective Edwards never testified to the precise locations of appellants' cell phones, themselves. We discern no other reason that the State would elicit the fact that these towers were in close proximity to the scene of the crime on the day and at the precise time other than to have the jury consider this as

evidence that appellants were, in fact, present at the scene of the crime.

Nor are we able to say, based upon our independent review of the record, that the error in the admission of Detective Edwards' opinion testimony, did not contribute to the verdict in this case. *See Perez v. State,* 420 Md. 57, 66, 21 A.3d 1048 (2011) ("The harmless error standard is highly favorable to the defendant, and 'the burden is on the State to show that [the error] was harmless beyond a reasonable doubt' and did not influence the outcome of the case") (citations omitted); *Bellamy v. State,* 403 Md. 308, 332, 941 A.2d 1107 (2008) (" 'Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict.' ") (citation omitted). The evidence was used for the sole purpose of placing Payne and Bond near the scene of the kidnapping and shooting of Glen Stewart and the burning of his body. Because we believe the testimony was critical and we are unable to say that the error in admitting Detective Edward's testimony was harmless beyond a reasonable doubt, we reverse and remand for a new trial.

## II

Appellant Payne, in an argument incorporated by reference by Bond, asserts that the trial court erred in admitting hearsay statements from the wiretap recordings as statements of a co-conspirator in the coverup story suggesting Payne and Bond had an alibi, on the grounds that there was no evidence that he was part of that conspiracy.

The State responds that the trial court properly admitted relevant evidence of appellants' efforts to conceal the evidence of their involvement in the murder as a statement by a co-conspirator of the party during the course and in furtherance of the conspiracy under Maryland Rule 5–803(a)(5). Alternatively, the statements were admissible as admissions made by each appellant as a party-opponent under Rule 5–803(a)(1),

relevant for the purposes of demonstrating consciousness of guilt.

In reply, Payne asserts that he did not adopt Bond's statements and that these statements were not admissible to him as statements by a party opponent. He also contends the statements by Bond are prohibited by *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

This issue concerns the false alibi that Payne and Bond allegedly created by having Keller, as well as McCant, inform the police that these men, along with Johnson and Jones, were with Keller around the time of the murder. In December of 2007, according to Keller, Bond informed her in a telephone conversation as to what he had told the police and she later told Payne in person about what Bond told her. Keller testified that appellants knew that she had lied to the police about her running out of gas and appellants coming to her assistance on the night of the murder. Counsel for appellants objected to the State attempting to introduce taped statements of Keller's December 12, 2007 phone conversations with Bond and with Payne. During the phone conversation between Bond and Keller, Keller told Bond that she was on her way to Payne's house and the following is her account of their exchange:

[Bond]: Alright that's what's up, alright [inaudible] when, ah, when you want to talk cause the D's came to talk to me today. So they caught me at my job, you see what I'm saying, so.

[Keller]: Alright.

[Bond]: So when you went to talk to them, you told them, you told them that the, we came to help you right?

[Keller]: Yeah.

[Bond]: Alright you said you ran out of gas, right?

[Keller]: Yeah.

[Bond]: Alrigh[t], that's what I was won ... I want to make sure the shit was cool. For real, for real.

[Keller]: Yeah.

[Bond]: You ain't, you ain't

[Keller]: (Inaudible)

[Bond]: Alright you ain't stay up there, none of that, right?

[Keller]: Uh ... uh.

[Bond]: Naa, I'm talking about that's what you told them, right?

[Keller]: Oh, yeah.

[Bond]: Alright, that's what's up, alright. I want to make sure I have this shit straight cause I ain't ... its been awhile, you see what I'm saying?

[Keller]: Right.

[Bond]: Alright, shit good you know what I mean, but when you get there tell Joey to call me see what I'm saying, cause they, cause they, they ...

[Keller]: Okay

[Bond]: They basically, they basically asked me the same thing they asked ya'll and shit, you see what I'm saying, what was ya'll doing and shit, I mean, they asked me some time and shit. I was like I don't know no times, yo, you give 'em the best you can, see what I'm saying?

[Keller]: Right.

[Bond]: I went ahead, I hit em' off.

[Keller]: That's what's up, alright yeah, that's what's up, yeah, that's what I said.

[Bond]: Yeah, that may help you out.

[Keller]: Okay, right, I'm a [ ... ] I should be at his house probably like 15 minutes and I'll tell him what happened.

[Bond]: What, what you be around somebody?

[Keller]: Uh, uh, no, I just don't be, you know sayin [sic] nothing over the phone.

[Bond]: I can dig it, I can dig it.

A few minutes after Bond's call to Keller, Keller called Payne, and she told him that "Jason just called me and they came to see him so umm I don't know if you ... inaudible ...

me to tell you when I get there or what's up." Payne told Keller to "just tell me when you get here."

Arguing that the evidence of Payne's "participation in uncharged conspiracy" was not established by a preponderance of the evidence, counsel for Payne asserted that the telephone conversation was inadmissible hearsay evidence. Counsel for Bond also objected on the basis that the statements improperly bolstered Keller's trial testimony. The State argued that the statements were admissible because McCant told Keller to lie and Keller "said the lie to the police and she knew that Jason [Bond] and Joey [Payne] were being investigated and that Tyrice [McCant] was being investigated and that they knew about this lie as well."

The trial judge opined:

I have no problem with proof of the conspiracy that creates—to create some sort of coverup to deflect the police. She said she discussed it directly with Jason Bond, so I have no problem with preponderance of the evidence showing participation with Bond in that. The question that I think is the much closer call is whether there is sufficient evidence that Joseph Payne was a participant.

After the State reminded the court that Keller had indicated she spoke to Payne face-to-face, the court agreed that the evidence was that "in December of 2007 she spoke to Jason and Joey; she talked to Jason on the phone about the lie she told the police; then she talked to Joe face-to-face about what she and Jason had just talked about." The court then concluded:

So, to prove by something other than statements is just virtually impossible to do. Seems to me on all the evidence before me that the players all knew that that was the story, and that is the genesis of conspiracy. She talked to them directly by phone with one; she talked to that other person face-to-face. I think that is sufficient foundation to allow the statements to come in.

Keller's phone conversations with Bond and Payne were admitted into evidence over a continuing objection from coun-

sel for both appellants. Keller testified at trial that Bond's reference to the "D's" meant "detectives." She also testified that she went to see Payne a few minutes after her phone call to him, and "told him about the conversation that me and Jason had[,]" "[b]ecause I knew that they had—that was what Jason wanted to call him about. I told him I would tell him." Keller also testified that, when she was subsequently interviewed by the police, she told the police "the truth," that "the boys did not come and fix my car that night."

The other five wiretap statements involved calls between Bond and Desmond Jones earlier on December 12, 2007. In those calls, admitted over objection, Jones told Bond about the police investigating the murder. Jones testified that, during those calls with Bond, they were "[t]alking about what us supposed to say," "about the story [they] were going to give them" regarding the murder.

The question presented concerns the hearsay rule. Our standard of review is as follows:

> Hearsay, under our rules, must be excluded as evidence at trial, unless it falls within an exception to the hearsay rule excluding such evidence or is 'permitted by applicable constitutional provisions or statutes.' Md. Rule 5–802. Thus, a circuit court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. Whether evidence is hearsay is an issue of law reviewed *de novo*.

*Bernadyn v. State,* 390 Md. 1, 8, 887 A.2d 602 (2005).

Appellants rely on the decision of the Court of Appeals in *State v. Rivenbark,* 311 Md. 147, 158, 533 A.2d 271 (1987), which held that the statements "made in connection with acts of concealment performed long after the conspirators have realized all benefits from the offense which they had agreed to commit" are inadmissible.

In that case, Rivenbark and Johnson, his accomplice, were charged with the May, 1981 felony murder and burglary of Johnson's aunt. On the day of the murder, Johnson's girl-friend, Shirley Wilson, met with Rivenbark, who told her:

"We got our alibis ... As long as everyone stays cool every-thing will be fine[,]" and he instructed Wilson to tell Johnson "to make sure the stuff was gone." *Rivenbark*, 311 Md. at 150–51, 533 A.2d 271. Six months later, after Wilson broke up with Johnson and informed police of Johnson's role in the murder, Wilson agreed to speak with Johnson while wearing a body wire. *Id.* at 151, 533 A.2d 271. Wilson "managed to elicit from Johnson numerous statements in which he inculpat-ed both himself and Rivenbark in [the] murder[,]" which were introduced into evidence by the State at trial. *Id.*

The issue was whether, under a well-established exception to the hearsay rule, a co-conspirator's statements made while the conspiracy is in effect and in furtherance of its aims are admissible against fellow conspirators. The principal question was whether, after the conspirators have attained their central objectives, there is an implied subsidiary conspiracy of con-cealment during which one co-conspirator can continue to bind his confederates with hearsay declarations. *Id.* at 158, 533 A.2d 271.

The Court of Appeals held:

We therefore agree with the Court of Special Appeals that the better reasoned cases reject the theory that every criminal conspiracy includes, by implication, a subsidiary conspiracy to conceal evidence of the substantive offense that the conspirators agreed to commit. Consequently, we adopt the Krulewitch view that a co-conspirator's statement is inadmissible unless it was made before the attainment of the conspiracy's central objective. This is not to say that statements made in connection with acts of concealment are never admissible. As noted above, conspirators do not necessarily achieve their chief aim at the precise moment when every element of a substantive offense has occurred. Before the conspirators can be said to have successfully attained their main object, they often must take additional steps, *e.g.*, fleeing, or disposing of the fruits and instrumen-talities of crime. Such acts further the conspiracy by assisting the conspirators in realizing the benefits from the offense which they agreed to commit.... Therefore, state-

ments made in connection with such acts occur before the conspirators have attained their chief objective and are admissible.... On the other hand, it is necessary to distinguish statements made in connection with acts of concealment performed long after the conspirators have realized all benefits from the offense which they had agreed to commit. Such statements occur after the conspirators attained their principal aim and are, therefore, ordinarily inadmissible.

*Id.* at 158, 533 A.2d 271 (citations omitted).

The *Rivenbark* Court observed that:

[I]f the conspirators expressly agree *at the outset* to engage in concerted acts of concealment after committing a substantive offense, then statements made in connection with those acts are admissible. In such a case, the conspirators' principal aim is not simply the successful completion of the substantive offense. Rather, by virtue of the actual agreement, their principal aim includes the acts of concealment as well.

*Id.* (emphasis added, citation omitted).

The Court pointed out that the acts of disposal of the instrumentalities of the crime, *i.e.,* when garbage men collected a plastic bag containing the shoestrings, ski cap and bloody gloves on May 25, 1981, were in furtherance of attaining the chief objective of the conspirators. By November 1981, however, the chief objective of the conspiracy to conceal the murder and burglary clearly had been achieved. *Id.* at 159, 533 A.2d 271.

The Court addressed the State's argument that the statements should be admitted:

The State also argues that Johnson and Rivenbark expressly conspired to conceal their offenses. In support of this contention, the State emphasizes the following facts which occurred in May 1981: Rivenbark's suggestion to Wilson that he and Johnson should not see one another for a while; Rivenbark's statement to Wilson that "We got our alibis"; Rivenbark's instruction to Johnson, communicated through Wilson, to "make sure the stuff was gone"; John-

son's destruction of the shoestrings, the ski cap, and the bloody gloves; and Johnson's continued beatings of Wilson.

These facts are not sufficient to establish an express conspiracy of concealment extending to November 1981.

*Id.*

The Court concluded that

[w]hile Rivenbark's statement that "We got our alibis," and Johnson's compliance with Rivenbark's order to "make sure the stuff was gone," may suggest an obvious understanding to conceal the crime soon after it happened, this evidence does not show an ongoing distinct and explicit agreement to conceal.

*Id.* at 159, 533 A.2d 271.

In this case, the kidnapping and murder of Glen Stewart occurred in the early morning hours of August 27, 2007. Keller told the false alibi story to the police sometime in early November. And, the conversations in which Bond and Keller confirmed that she told this story to the police occurred on December 12, 2007. There is no evidence in this case that there was an express agreement between the parties, *at the outset,* to engage in concerted acts of concealment after committing the kidnapping and murder. The chief objective of appellants in committing the substantive offenses of kidnapping and murder was to punish and/or retaliate against Stewart because they suspected him of reporting the robbery of Bland to the police. Because the recordings admitted into evidence were neither hearsay statements of an agreement entered into *at the outset of the substantive criminal event* nor an express agreement to conceal *in furtherance of attaining the chief objective, i.e., to silence* Stewart, the hearsay statements are inadmissible to establish an express conspiracy of concealment.

■ Alternatively, the State contends that the wiretap recordings of Bond and Payne were admissible under Maryland

Rule 5–803(a)(1),[8] which provides:

Hearsay exceptions: Unavailability of declarant not required

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(a) Statement by party-opponent. A statement that is offered against a party and is:

(1) The party's own statement, in either an individual or representative capacity; . . .

An admission of a party opponent is admissible because "an admission is a statement of pertinent facts which, in connection with proof of other facts, tends to prove guilt. . . ." *State v. Brown*, 327 Md. 81, 88, 607 A.2d 923 (1992) (quoting *Holland v. State*, 244 Md. 671, 673, 224 A.2d 864 (1966)). Professor McLain has explained what is meant by an "admission," as follows:

The term "admission" is misleading, in that it suggests that an out-of-court statement must have been against the party-opponent's interest at the time it was made in order for it to be admissible. This suggestion is compounded by frequent references to this hearsay exception as involving "admissions against interest." To the contrary, there is no requirement that the out-of-court statement have been against the party's interest at the time it was made; it even may have been self-serving then.

\*        \*        \*

The hearsay exception thus is better termed "statements of a party-opponent," because the only requirements for

---

**8.** Although this argument does not appear to have been raised in the trial court, this Court may "affirm the trial court if it reached the right result for the wrong reasons." *In re: Delric H.*, 150 Md.App. 234, 241 n. 7, 819 A.2d 1117 (2003) (quoting *Hurt v. Chavis*, 128 Md.App. 626, 640, 739 A.2d 924 (1999)); *see also Robeson v. State*, 285 Md. 498, 502, 403 A.2d 1221 (1979) (where the record in a case adequately demonstrates that the trial court's decision was correct, although not on grounds relied upon by trial court or argued by parties, appellate court will affirm), *cert. denied*, 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980).

qualification of a statement under it are that (1) the statement was made, adopted, or authorized by a party or that party's agent or coconspirator; (2) the statement is offered in evidence against that party by an opposing party (it is not offered by the party who made the statement); and (3) as with all evidence, the statement must be relevant to a material fact.

McLain, *Maryland Evidence*, § 801(4):1, at 96–97 (2001) (footnotes omitted); *see generally*, Murphy, *Maryland Evidence Handbook*, § 805, at 390 (4th ed. 2010) ("Under the 'admission' exception, the plaintiff can introduce against the defendant anything that the defendant has said (or written, or done) which is helpful to the plaintiff's case").

Here, we have no difficulty concluding that Bond's statements in the wiretaps were admissible against him as statements by a party opponent. If there is any problematic issue, that concerns whether those statements were also admissible against Payne. The only recording involving Payne is the last one between him and Keller. In that recording, Keller informs Payne that "Jason just called me and they came to see him so umm I don't know if you ... inaudible ... me to tell you when I get there or what's up," to which Payne replied, "okay, just tell me when you get here." Keller testified at trial that, following this phone conversation, she went and saw Payne directly. At that time, she told Payne about her conversation earlier that day with Bond, inferentially referring to the conversation about maintaining the false alibi in the face of further police investigation. We are persuaded the statements were admissible as to each party. We also note that, during jury instructions, the trial court instructed the jury that it was to "consider the evidence as it relate[s] to each defendant separately and you must consider separately each offense charged against each defendant."

Replying to this alternative theory, Payne raises the argument that Bond's statements were not admissible against him under *Bruton, supra.* Under *Bruton,* in a joint trial of co-defendants, the prosecution may not move into evidence the confession of a non-testifying defendant that inculpates a co-

defendant, even if the jury is given an appropriate limiting instruction. *Bruton,* 391 U.S. at 137, 88 S.Ct. 1620. This Court has explained that:

> *Bruton,* of course, was establishing the broad constitutional principle that curative instructions should not be relied upon to legitimate the admission of the confession of a non-testifying defendant at a joint trial, if in the course of that confession the confessor asserts that the codefendant also participated in the crime.

*Williams v. State,* 131 Md.App. 1, 39, 748 A.2d 1, *cert. denied,* 359 Md. 335, 753 A.2d 1032 (2000)

However, "there is a distinction between a confession and an admission in criminal cases in that a confession is a direct acknowledgment of guilt and an admission is a statement of pertinent facts which, in connection with proof of other facts, tends to prove guilt." *Holland,* 244 Md. at 673, 224 A.2d 864. *Bruton* is distinguishable because the wiretap recordings in this case were admissions, at most reflecting a consciousness of guilt; they were not confessions to the murder. *Williams, supra,* is instructive:

> In this case, of course, we are not dealing with a *Bruton*-like assertion by the codefendant that the appellant actually participated in the crime. We are not dealing with the circumstance described by *Bruton* as one where "the power-fully incriminating extrajudicial statements of a codefen-dant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." 391 U.S. at 135–36 [88 S.Ct. 1620]. We are dealing, rather, with a statement by the codefendant that the codefendant's "stepmother thought that [the appellant] did it." It is not even passing on the knowledge of or an observation by the stepmother but only her belief or suspicion.

*Williams,* 131 Md.App. at 39, 748 A.2d 1.

Accordingly, we are persuaded that the wiretap recordings were admissible as to both Payne and Bond as statements of a party opponent. The trial court properly exercised its discre-

tion in admitting them, albeit on grounds different than argued by the parties at trial.

## III

■ Appellant Bond next assigns error to the trial court's denial of his motion for a mistrial when the State elicited testimony from both McCant and Detective Barton that he asserts was inadmissible hearsay regarding the identity of the individuals who murdered Glen Stewart. The State initially responds by pointing out that the only motion for a mistrial came during Detective Barton's testimony and that Bond's appellate argument that the testimony was "hearsay," is too general for this Court to consider. Our consideration of this preliminary argument will not detain us for long because we conclude that the record from the trial is more than sufficient for us to address this question presented. On the merits, the State observes that the trial court properly exercised its discretion in denying the motion for mistrial. Because we agree that the trial court properly exercised its discretion in the matter, we concur with the State's argument on the merits.

While the mistrial motion, ultimately concerning anonymous tips about the case, came during Detective Barton's testimony, the initial testimony about the tips came from the alleged tipster herself, Tyrice McCant:

[STATE]: In those calls—let me ask you. In those calls did you name the individuals involved in the murder of Glen Stewart?

[WITNESS]: Yes.

[STATE]: What were the names you mentioned?

[BOND'S COUNSEL]: Objection.

THE COURT: Come on up.

At a bench conference, both defense counsel objected on the grounds of hearsay. The court agreed, informing the State, in pertinent part, as follows:

Part of the problem is—the problem with this is it's admissible to say what the police do, how they got a lead and why they acted on it. It's not admissible to prove that these people actually committed a murder because that couldn't be—that would be hearsay. But it relates not to who committed the murder, it relates to when the police then acted at a later point in time. It relates to the testimony that is going to come.

In addition, the following ensued:

THE COURT: Enough. Enough. You can't get into the substance of what she told because it is hearsay and it's based on things—you can ask did she give the information. You can follow up with the detectives and what they did to follow up on it.

[STATE]: I can ask about names?

THE COURT: No. No.

[STATE]: Not to provide but did you.

THE COURT: Did she, yes.

[BOND'S COUNSEL]: I would object to that. I just don't think it's proper. First of all, she is not part of the investigation. She testifies. What did you do as far as. You can't do it. The law says you can't talk to a person, then receive information from that person, so then I did this and that. You can't do it.

[STATE]: Not names. I am asking the question.

[PAYNE'S COUNSEL]: Your Honor, you realize I join in the objection?

THE COURT: I do realize that.

(The discussion at sidebar concluded.)

[STATE]: I was asking you questions about the anonymous calls. In those anonymous calls, did you provide names of individuals in the murder of Glen Stewart?

[WITNESS]: Yes.

At a later point in the trial, Detective Barton testified that, during the course of his investigation into the murder of Glen Stewart, he received anonymous telephone calls in the late

summer of 2007 from a female who contacted the police "out of the blue." The following testimony was elicited:

[STATE]: Now, during your investigation while you are looking at cell phone records, does there come a time when you receive an anonymous call or your office receives anonymous calls?

[WITNESS]: Yes.

[STATE]: Are these anonymous calls in connection with your investigation of the murder of Glen Stewart?

[BOND'S COUNSEL]: Objection.

THE COURT: Overruled. Can you ask questions that are non-leading?

[STATE]: What are these anonymous calls related to?

[WITNESS]: They were related to this murder that we are speaking of now.

[STATE]: Can you tell the jury what, if anything, you found out as a result of these anonymous calls?

[PAYNE'S COUNSEL]: Objection.

[BOND'S COUNSEL]: Objection.

THE COURT: Overruled.

[WITNESS]: Anonymous female called in on August 4th totally unsolicited on our part. She called in out of the blue and wanted to give information in reference to the Glen Stewart murder. She advised—

[PAYNE'S COUNSEL]: Objection.

THE COURT: Sustained.

After ascertaining that the caller made four anonymous calls, Detective Barton's testimony continued:

[STATE]: As a result of receiving those anonymous calls, where, if at all, or in what direction did that take you in your investigation?

[WITNESS]: Well, couple different things. Number one, it gave us the names or information that led to—

[PAYNE'S COUNSEL]: Objection.

THE COURT: Overruled.

[BOND'S COUNSEL]: I object also.

[WITNESS]: It gave us the names or information that led to the identity of the persons that she was speaking of that she said were responsible for the murder of Glen Stewart.

[PAYNE'S COUNSEL]: Objection. Move to strike. May we approach?

[BOND'S COUNSEL]: Yes.

THE COURT: Come up.

(The following discussion was held at sidebar:)

[PAYNE'S COUNSEL]: I move for mistrial. That is obviously clearly hearsay and conclusionary and I move for mistrial. That was patent hearsay, and I did everything I could to alert the Court that was coming.

THE COURT: He didn't even say who they identified.

[PAYNE'S COUNSEL]: He said as a result of that, he identified who committed the murder of Glen Stewart.

THE COURT: That's not what he just—

[BOND'S COUNSEL]: Yes, he did. I object and ask for a mistrial also.

THE COURT: He said they identified the persons that the caller said committed the crime.

[BOND'S COUNSEL]: No.

[PAYNE'S COUNSEL]: That's hearsay. That's a statement from an anonymous caller. It's hearsay who did the murder that is inadmissible.

THE COURT: What do you want to say?

[STATE]: Just that I agree with you, first of all, he hasn't said anything specific about the conversations. All he said was—all I am doing is trying to set up just to get through the investigation and am trying to speed it along so that we can get, sort of, just a line on where he's going. Not trying to go into specifics. I don't need him to go into specifics of conversations, nor do I want him to.

[BOND'S COUNSEL]: By inference, he did. That is exactly where you led him. By inference, these men committed the murder because the caller said they did it.

THE COURT: First of all, we already had the caller on the stand who talked about what she said.

[BOND'S COUNSEL]: But the truth be known, she said my client didn't have anything to do with it in one of the calls.

THE COURT: Part of—I sustain the objection to give the contents of whatever she said. He developed leads as a result of that; that is permissible. The leads were—obviously this person is calling saying here is information she has about the murder. Stay away from the specifics.

[BOND'S COUNSEL]: It was information about the commission—who committed the murder. And lo and behold, these men are sitting here.

[PAYNE'S COUNSEL]: I would like to put on the record all my objections to the testimony regarding the telephone calls, frequency of calls, was got in through Detective Edwards. It's completely cumulative and prejudicial to our clients.

THE COURT: Let's move on. The State's out of that area.

(The discussion at sidebar was concluded.)

THE COURT: Any remarks as to the content of that call is stricken. Proceed.

[STATE]: Detective, were you ever able to identify who the maker of those anonymous calls was?

[WITNESS]: Yes.

Thereafter, Detective Barton testified, without objection, that the police set up dialed number recorders for Payne, Bond, Jones and Johnson. Bond claims that the above quoted testimony, as well as the further testimony concerning the police investigation of the codefendants, was inadmissible hearsay, and that the court erred in denying the motion for a mistrial. The Court of Appeals, in *Hunt v. State*, 321 Md. 387,

583 A.2d 218 (1990), explained that the grant of a motion for mistrial is reserved for only circumstances in which a defendant's right to an impartial jury has been compromised:

[T]he declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice. *Jones [v. State]*, 310 Md. 569, 587 [530 A.2d 743 (1987) ]. This Court has recognized that granting a motion for a mistrial lies within the discretion of the trial judge. *Poole v. State*, 295 Md. 167, 183 [453 A.2d 1218] (1983). The trial judge, who hears the entire case and can weigh the danger of prejudice arising from improper testimony, is in the best position to determine if the extraordinary remedy of a mistrial is appropriate. We will not reverse a trial court's denial of a motion for mistrial unless the defendant was so clearly prejudiced that the denial constituted an abuse of discretion. *Johnson v. State*, 303 Md. 487, 516 [495 A.2d 1] (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986) (*Johnson II* ).

*Id.* at 422, 583 A.2d 218.

As this Court recently explained:

"The [trial] judge is physically on the scene, able to observe matters not usually reflected in a cold record. The judge is able to ascertain the demeanor of the witnesses and to note the reaction of the jurors and counsel to inadmissible matters. That is to say, the judge has his finger on the pulse of the trial."

*Washington v. State*, 191 Md.App. 48, 103, 990 A.2d 549 (quoting *State v. Hawkins*, 326 Md. 270, 278, 604 A.2d 489 (1992)), *cert. denied*, 415 Md. 43, 997 A.2d 792 (2010).

We conclude that Detective Barton's testimony was nonhearsay. The general rule for the admission of nonhearsay is as follows:

[A] relevant extrajudicial statement is admissible as nonhearsay when it is offered for the purpose of showing that a person relied on and acted upon the statement and is not introduced for the purpose of showing that the facts asserted in the statement are true.

*Parker v. State,* 408 Md. 428, 438, 970 A.2d 320 (2009) (quoting *Graves v. State,* 334 Md. 30, 38, 637 A.2d 1197 (1994)); *see also Conyers v. State,* 354 Md. 132, 158, 729 A.2d 910 ("An out-of-court statement is admissible if it is not being offered for the truth of the matter asserted or if it falls within one of the recognized exceptions to the hearsay rule"), *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *Daniel v. State,* 132 Md.App. 576, 587–89, 753 A.2d 545 (concluding that, even assuming witness's testimony was based upon declarant's statements, the testimony that declarant was "eliminated as a suspect," did not offer declarant's statements into evidence to prove the truth of the matter asserted and were not hearsay), *cert. denied,* 361 Md. 232, 760 A.2d 1106 (2000); *Williams v. State,* 99 Md.App. 711, 725, 639 A.2d 180 (1994) (holding that witness's recounting of statement made by the person being arrested was nonhearsay because it was not being offered for its truth), *aff'd on other grounds,* 344 Md. 358, 686 A.2d 1096 (1996).

Neither McCant nor Detective Barton testified that the anonymous tipster named Payne or Bond. The testimony was simply that names were given to the police. As we stated in a case concerning statements made by an interviewee, as opposed to an anonymous tipster:

> As the trial court correctly reasoned, what the officer "draws upon to make his decisions as an investigator as to arrest or not arrest, is not to adhere to the same rules that we do here." In other words, an interviewee's statements to an investigating police officer are not "hearsay" unless and until they are offered into evidence for their truth.

*Daniel,* 132 Md.App. at 589, 753 A.2d 545.

Moreover, even assuming that the jury could infer that the anonymous caller identified appellants in her telephone call, the fact that the trial judge gave a curative instruction to the jury and admonished that "[a]ny remarks as to the content of that call is stricken" weighs heavily in our determination of prejudice, *vel non,* to appellants. This is particularly true in light of the presumption that, when curative instructions are

given, a jury can and will follow them. *Brooks v. State*, 85 Md.App. 355, 360, 584 A.2d 82 (1991); *see also Spain v. State*, 386 Md. 145, 160, 872 A.2d 25 (2005) ("Maryland courts long have subscribed to the presumption that juries are able to follow the instructions given to them by the trial judge, particularly where the record reveals no overt act on the jury's part to the contrary"). The court did not err in denying the motion for mistrial.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY BALTIMORE COUNTY.**